**UNITED STATES of America,**

v.

**Brent BIRKETT and Franklin Sanchez, Defendants.**

No. 99 CR. 0338(RWS).

United States District Court, S.D. New York.

March 6, 2006.

Michael J. Garcia, United States Attorney for the Southern District of New York by Elie Honig, Assistant U.S. Attorney, New York City, for the United States of America.

Joshua L. Dratel, Esq., New York City, for Defendant Brent Birkett.

Stewart L. Orden, Esq., New York City, for Defendant Franklin Sanchez.

## OPINION

SWEET, District Judge.

On July 8, 2005, the Second Circuit issued a Summary Order (the "Order") remanding the cases of defendant Brent Birkett ("Birkett") and Franklin Sanchez ("Sanchez") (collectively, the "Defendants") to this Court to: (1) consider whether the admission at trial of six plea allocutions of co-conspirators, in violation of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("*Crawford* "), constituted plain error; (2) determine whether reconsideration of the prior denials of the Defendants' Rule 33 motions is necessary; and (3) re-sentence the Defendants pursuant to *United States v. Fagans,* 406 F.3d 138 (2d Cir.2005). The parties requested, and the Court agreed, to decide the *Crawford* and Rule 33 issues initially and, if no new trial was granted, to permit further briefing on the Defendants' re-sentencings under *Fagans.*

For the reasons set forth below, the *Crawford* error did not amount to plain error, and no reconsideration of the prior denials of Defendants' Rule 33 motions is warranted. As such, no new trial will be

ordered. Defendants will proceed to their respective re-sentencings.

### Prior Proceedings

A superseding indictment was filed on September 24, 1999, charging Defendants and ten other co-defendants with participating in a conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, in a form known as "crack," in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(A), and 846.

Trial against Birkett and Sanchez began on May 15, 2000, and a guilty verdict against both was returned on May 19, 2000.

By motion of September 29, 2000, Birkett and Sanchez moved to set aside the verdict and grant a new trial under Rule 33, Fed.R.Crim.P., on the basis of two handwritten letters purportedly written before trial by James Clyburn ("Clyburn"), an accomplice witness. Defendants argued that these handwritten letters were inconsistent with material portions of Clyburn's trial testimony and established that Clyburn knew that the government had targeted Birkett and Sanchez and that the government had urged Clyburn and his co-defendants to testify against Birkett and Sanchez. The motion was heard on December 6, 2000 and denied by opinion of January 10, 2001 (the "January 10 Opinion"), familiarity with which is assumed. See United States v. Sanchez, No. S1 99 CR 338, 2001 WL 26212 (S.D.N.Y. Jan. 10, 2001).

In the course of sentencing Birkett and Sanchez's co-defendants, Fatico hearings were conducted on June 27, 2001 and September 4, 2001, and Clyburn testified at both. By motion of February 4, 2003, Defendants again moved to set aside the verdict and grant a new trial under Rule 33, Fed.R.Crim.P., contending that during the Fatico hearings Clyburn admitted to committing perjury while testifying at De-

fendants' trial. Specifically, Defendants argued that Clyburn perjured himself at trial by steadfastly denying that he had written two letters. He subsequently admitted that he had written these letters when he was confronted by the government's expert's opinion about the handwriting in the letters. Additionally, Defendants asserted that Randolph Helvy ("Helvy"), another accomplice witness at trial, also changed his testimony at the Fatico hearing with respect to cooperation between accomplices. The Defendants' second Rule 33 motion was heard on March 12, 2003 and was denied by opinion of April 18, 2003 (the "April 18 Opinion"), familiarity with which is assumed. See United States v. Sanchez, No. S1 99 CR 338, 2003 WL 1907864 (S.D.N.Y. April 18, 2003).

On February 10, 2004, Birkett and Sanchez were each sentenced to 360 months imprisonment to be followed by ten years of supervised release. Defendants currently are serving their sentences.

On December 17, 2004, Defendants appealed their convictions to the Second Circuit, arguing that the admission of six plea allocutions of Defendants' co-conspirators in violation of Crawford warranted a new trial. Defendants further argued that the trial court abused its discretion in denying Defendants' Rule 33 motions as the trial court's Rule 33 holdings may have relied on the six plea allocutions which, under Crawford, amounted to inadmissible hearsay. Finally, Defendants argued that the sentences imposed on them under the United States Sentencing Guidelines were invalid under the Supreme Court's holding in Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

The Second Circuit issued its Order on July 8, 2005, remanding the Crawford, Rule 33, and re-sentencing issues to this

Court. The motion was marked fully submitted on November 22, 2005.

## Discussion

### I. *No Plain Error Under Crawford*

### A. *Plain Error Standard*

■ In its July 8, 2005 Order, the Second Circuit remanded Defendants' claim that the admission at trial of the plea allocutions of six co-conspirators violated their confrontation rights under *Crawford. See United States v. Birkett,* 138 Fed. Appx. 375, 377–78, 2005 WL 1607185, *2 (2d Cir.2005). The Second Circuit held that Defendants had failed to invoke the Confrontation Clause expressly in their objection to the introduction of the plea allocutions during trial; as such, the Circuit instructed that the *Crawford* error be evaluated under a plain error analysis.

■ Under a plain error standard, the defendant bears the burden of showing "1) an error, 2) that is plain, 3) that affects substantial rights." *United States v. Gordon,* 291 F.3d 181, 191 (2d Cir.2002) (citations omitted). If an error meets these first three requirements, "the Court engages in a fourth consideration: whether or not to exercise its discretion to correct the error. The plain error should be corrected only if it 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Bruno,* 383 F.3d 65, 79 (2d Cir.2004), *quoting Jones v. United States,* 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

Where, as here, a supervening decision resulted in constitutional error, the Second Circuit has directed that the court conduct a "modified plain error" analysis in which the government bears the burden of persuasion as to whether substantial rights have been affected. *See United States v. Bruno,* 383 F.3d 65, 79 n. 8 (2d Cir.2004), *quoting United States v. Thomas,* 274 F.3d 655, 668 n. 15 (2d Cir.2001) (*en banc*). The Second Circuit questioned, but did not resolve, whether the Supreme Court's decision in *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), implicitly overruled the Circuit's "modified plain error analysis." However, in this instance, it is unnecessary to decide the continued viability of the "modified plain-error" approach because, as will be set forth in greater detail below, even absent the allocutions, other evidence in this case was sufficient to demonstrate the existence of the charged conspiracy regardless of the allocation of burden.

The government concedes that the introduction of six guilty plea allocutions was plain error, as it is now "'clear' or 'obvious[,]'" *Gordon,* 291 F.3d at 193 (citation omitted), that the admission of these allocutions violated Defendants' rights under the Confrontation Clause of the Sixth Amendment. The issue before the Court, therefore, is whether the Sixth Amendment violation affected "substantial rights," and, if so, whether this Court should exercise its discretion to correct that error.

■ In determining whether an error affects substantial rights, the court considers whether error "is prejudicial and ... affected the outcome of the district court proceedings." *Thomas,* 274 F.3d at 668 (internal quotation marks and citations omitted). In determining whether a guilty plea admitted in violation of *Crawford* affected substantial rights, the Second Circuit has directed that the question to be resolved, under the plain error test, is whether the court "can conclude[ ] with fair assurance that this evidence did not substantially influence the jury." *Bruno,* 383 F.3d at 79, *quoting United States v. Jean–Baptiste,* 166 F.3d 102, 108 (2d Cir. 1999). Under this standard, "[a]n error in

the admission of evidence may be deemed harmless only if it is highly probable that the error did not contribute to the verdict." *Id.* at 79–80, *quoting Jean–Baptiste,* 166 F.3d at 108 (internal quotation marks omitted).

 As *Bruno* directed:

In making this determination, we consider principally whether the government's case against the defendant was strong; whether the evidence in question bears on an issue that is plainly critical to the jury's decision ...; whether the evidence was emphasized in the government's presentation of its case and in its argument to the jury; and whether the case was close.

*Id.* at 80, *quoting Jean–Baptiste,* 166 F.3d at 108–09 (internal quotation marks and citations omitted).

Here, the government concedes the *Crawford* error at issue but argues that the error does not satisfy the third prong of the plain error test. Specifically, the government contends that, in light of the overwhelming evidence adduced at trial about the existence of the conspiracy, the admission of the six plea allocutions did not affect the outcome of the trial.

Defendants counter that the admission of the six guilty plea allocutions constitutes plain error as to both the guilty verdict returned by the jury and the jury's special finding of the amount of cocaine base involved in the conspiracy. Defendants argue that the government's case was not strong and that the government relied heavily on the plea allocutions during summation. Additionally, Defendants assert that the plea allocutions, in which each of the co-conspirators pled guilty to the sole count in the indictment, which charged conspiracy to distribute fifty grams or more of cocaine base, directed the jury's

finding as to the amount of cocaine base attributable to the conspiracy.

## B. *Relevant Facts*

### 1. *Evidence Presented At Trial*

The government presented evidence at trial that the Defendants had run a crack cocaine business called the "Purple Crew" out of the courtyard of an apartment building located at 560 West 144th Street in Manhattan from 1994 through 1999. (Tr.[1] 53–54, 57, 229–32, 248, 338–40.)

The government's key evidence included (1) the testimony of three accomplices, James Clyburn ("Clyburn"), Randolph Helvy ("Helvy"), and William Martin ("Martin"), who described how Defendants' crack business worked and identified Birkett and Sanchez as leaders of the business; (2) the Defendants' post-arrest statements, in which each acknowledged that they knew the police were coming for them; (3) cocaine and drug paraphernalia seized from a stash house used by the Defendants; (4) videotapes of the Defendants' co-defendants engaged in hand-to-hand transactions with customers in the courtyard of 560 West 144th Street as well as videotapes of certain co-defendants entering and exiting the buildings in which their stash houses were located; (5) the testimony of an undercover police officer who purchased crack cocaine on a number of occasions from the Defendants' co-defendants; (6) the testimony of officers of the New York City Police Department ("NYPD") who conducted surveillance of the Defendants during the course of the conspiracy; (7) the guilty plea allocutions of six of the Defendants' co-conspirators; and (8) telephone records demonstrating that Birkett and Sanchez were in constant communication with one another during

---

**1.** "Tr." refers to the trial transcript. "GX" refers to the Government's trial exhibits.

the course of the conspiracy and were in constant communication with those alleged to have been working for them.

According to the evidence presented by the government at trial, Birkett and Sanchez employed a number of workers who held various positions within the Purple Crew, including Clyburn, Helvy, Martin, Shannon Mont ("Mont"), Damion Gowdie ("Gowdie"), Sidney Sass ("Sass"), Michael Richardson ("Richardson"), James Jones ("Jones"), and Reda Solomon ("Solomon"). (Tr. 53–57, 229–32, 338–40, 532–40.)

At the very bottom of the Purple Crew were deliverymen or couriers. Martin, one such courier, testified at trial pursuant to a cooperation agreement with the government. (Tr. 328–427.) His testimony asserted that Birkett and Sanchez used couriers to transport cocaine from their suppliers to their stash houses where it was "cooked" into crack cocaine, "bagged up" into hundreds of $5 baggies, and then delivered to Defendants' sellers at the courtyard of 560 West 144th Street. (Tr. 338–42.) Martin began working for Birkett and Sanchez in 1998. (Tr. 333–34.) From 1998 until his arrest in March 1999, Martin testified that he delivered cocaine from the Defendants' stash house on Edgecomb Avenue to a second stash house on 142 Street and to the courtyard of 560 West 144th Street at least three times a week. (Tr. 342.) During this period, Martin delivered four "double-ups" to the street sellers four to five times a day (each "double-up" contained approximately 44 individual bags of crack cocaine that were later sold for $5 a piece). (Tr. 354–55.) For his efforts, Martin was paid in kind, typically six $5 bags of crack cocaine per delivery. (Tr. 360.)

In addition to the couriers, trial testimony established that the Purple Crew also employed a cadre of "pitchers" or street sellers. Those individuals sold the $5 bags of crack cocaine to customers in the courtyard of 560 West 144th Street. Sales occurred seven days a week at all hours of the day and night. (Tr. 231–35, 348–50.) Helvy, one of the Purple Crew's regular street sellers, testified at trial pursuant to a cooperation agreement with the government. (Tr. 224–317.) Helvy stated that he sold crack cocaine for Birkett and Sanchez at least three days a week from 1994 until his arrest in March 1999. (Tr. 231–32, 239–41.) During this period, Helvy claimed that he was selling as much as $2,000 worth of crack cocaine per day. (Tr. 242.)

Managers or "lieutenants" sat above the street sellers in the hierarchy of the Purple Crew and were tasked with keeping the sellers stocked with drugs and with accounting for the cash proceeds at the end of each day. (Tr. 242–43.) Clyburn, who also testified as a government witness at trial pursuant to a cooperation agreement, stated that he as a street seller for Birkett and Sanchez for a period of time and subsequently was promoted to a managerial position within the Purple Crew. (Tr. 61–62, 65–66.)

The government adduced evidence at trial to place Birkett and Sanchez at the top of the Purple Crew and to attribute responsibility to them for obtaining and packaging the crack cocaine sold by the organization. (Tr. 45, 61–62, 70–71, 89.) According to the government's evidence, at its height in 1997 and 1998, the Purple Crew was selling approximately $10,000 of crack cocaine each day. (Tr. 68.)

On March 23, 1999, Birkett was arrested by members of the NYPD. Following his arrest, Birkett told the arresting officers that he knew the police were coming for him. (Tr. 424–25.) On September 21, 1999, Sanchez was arrested by the NYPD, and following his arrest, Sanchez also stated that he knew the police were coming for

him. In addition, Sanchez told the officers that he knew that Richardson had been arrested a few days earlier. (Tr. 446–47.) Additionally, the evidence at trial established that Sanchez was stopped by NYPD officers in late January 1999, and, during the course of this stop, Sanchez falsely identified himself as "David Lopez" by furnishing a New York State driver's license with his photograph in the name of "David Lopez." At the time of this stop, Sanchez had in his possession a total of $2,260 in cash. Of this cash, $324 was in his right pants pocket, $360 was wrapped in a single rubber band in his left pants pocket, $1,000 was wrapped with two rubber bands in his jacket pocket and $576 was found in his wallet. (Tr. 193–94.)

Neither Birkett nor Sanchez presented a defense. Attorneys for both Defendants focused their summations on the testimony of the three accomplice witnesses, Clyburn, Helvy and Martin. Defense counsel contended that Clyburn was the ringleader of a plan to fabricate testimony asserting that Birkett and Sanchez had been the leaders of the Purple Crew. Defense argued that Clyburn convinced Helvy and Martin to support this fabricated story while all three were in federal custody prior to Defendants' trial; defense further argued that all three men agreed to cooperate in the hopes of receiving reduced sentences. In rebuttal, the government emphasized the substantial evidence that corroborated the testimony of Clyburn, Helvy and Martin. (Tr. 643–53.)

### 2. *Government's Reliance On Plea Allocutions*

During the trial, the government offered the guilty plea allocutions of six co-conspirators: Sass, Gowdie, Mont, Richardson, Jones and Solomon. The government used these plea allocutions to establish the existence of a conspiracy, but no plea allocution mentioned Birkett or Sanchez by name. (Tr. 535–49; GX 700–701.) The government presented additional evidence to show the guilt of these co-conspirators, including testimony from an undercover police officer about crack purchases he had made from Sass, Gowdie, Mont and Jones, (Tr. 206–11.), and videotapes of Sass and Mont selling crack cocaine to customers. (Tr. 442–44.)

In closing the Government referred to the allocutions as one piece of evidence that proved the existence of the crack cocaine conspiracy charged in the indictment:

> Nobody's really arguing much about the fact that there was a massive crack conspiracy here ... And you also know it because nine people have admitted to participating in this conspiracy: the three witnesses that you heard, they all obviously admitted it, and the six co-conspirators whose admissions you heard from their guilty plea allocutions which we read at the end of yesterday, these six people, Michael Richardson, Shannon Mont, Damion Gowdie, Sidney Sass, James Jones and Reda Solomon.

(Tr. 562–63.) The government also reviewed other evidence presented during the course of trial, including: (1) the testimony of the undercover officer who repeatedly purchased crack cocaine from members of the conspiracy (Tr. 562–63); (2) the seizure of drugs and drug paraphernalia from the Defendants' stash apartments (Tr. 563); (3) the telephone records establishing that the Defendants and their co-conspirators were in constant communication (Tr. 560–61); and (4) the testimony of the three aforementioned accomplice witnesses (Clyburn, Helvy and Martin), all of whom admitted to their participation in the drug organization. (Tr. 563.) The government argued that all

of this evidence proved the existence of the charged conspiracy.

When the government in its summation argued that it had demonstrated beyond a reasonable doubt that Birkett and Sanchez knowingly participated in the narcotics conspiracy, it relied on evidence other than the plea allocutions. Specifically, the government highlighted: (1) the in-court testimony of the three accomplice witnesses who directly implicated Birkett and Sanchez; (2) telephone records showing Birkett and Sanchez in constant communication with each other and other co-conspirators; (3) evidence of otherwise unexplained wealth, including the $2,260 in cash found on Sanchez when he was stopped by the police in 1999 and the expensive sport utility vehicles each Defendant was driving at the time of his arrest; (4) efforts at concealment by both Birkett and Sanchez, including the latter's use of false identification when stopped by police in 1999 and both Defendants' use of cars and telephones registered in the names of other people; and (5) the incriminating post-arrest statements of Birkett and Sanchez, in which each admitted that they had anticipated their arrests. (Tr. 45, 61–69, 82, 230–37, 241, 559–61, 574–84; GX 200, 203, 206.)

The defense, it its summation, did not challenge the existence of the conspiracy but instead focused its argument on whether the government had proved the Defendants' membership in the conspiracy beyond a reasonable doubt.

In instructing the jury, the Court emphasized the limited purposes for which the plea allocutions had been admitted:

> You have also heard that Damion Gowdie, James Jones, Shannon Mont., Michael Richardson, Sidney Sass, and Red Solomon made statements about their participation in certain crimes. You can consider these statements as evidence of the activities of the person who made the statement, and that is relevant to the case. You can consider the statement as evidence, and like any other piece of evidence in the case, give the statements such weight as you believe is appropriate. However, understand that though you may consider these statements only on the following issues: whether there was a conspiracy to distribute and possess with an intent to distribute crack cocaine as charged in Count One, and two, what if anything these individuals did in order to further the objects of the conspiracy. The question whether the defendants on trial were also members of the conspiracy alleged in Count One is an issue for which you will have to rely upon other evidence. There is no evidence in these statements naming any other defendants or co-conspirators, and such a statement would be inappropriate under the law. If you find based on these statements that the conspiracy as charged in the indictment existed, then you have to decide as a separate question whether each defendant was part of the conspiracy based on the other evidence in the case. Those pleas do not answer that question one way or another.

(Tr. 685–86.)

### C. *No New Trial Is Warranted*

Given the overwhelming evidence adduced at trial against Defendants, this Court carries "fair assurance" that the *Crawford* error did not "substantially influence the jury" or contribute to the guilty verdict obtained against the Defendants. *Bruno,* 383 F.3d at 79. The admission of the six plea allocutions did not constitute plain error because it did not affect Defendants' "substantial rights." *Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718

(1997). Because the *Crawford* error did not seriously affect the fairness, integrity or public reputation of the judicial proceedings, the outcome is the same no matter which party bears the burden of persuasion on the "substantial rights" prong of the plain error test. *See Bruno*, 383 F.3d at 79 n. 8 (where the error results from a supervening judicial decision, the Second Circuit has applied a "modified plain error" test and held that the Government, not the defendant, bears the burden of persuasion on the issue of whether the defendant's substantial rights have been affected).

First, none of the six plea allocutions identified either Birkett or Sanchez as members of the conspiracy. Second, the plea allocutions were admitted only to prove the existence of the narcotics conspiracy and actions of the pleading co-conspirators in furtherance of the conspiracy. The government presented overwhelming evidence aside from the plea allocutions to establish that Defendants were involved in a crack distribution conspiracy and that the charged conspiracy involved fifty grams or more of cocaine base.

The government offered the testimony of Clyburn, Helvy, and Martin, all cooperating witnesses who testified to being employees of the Defendants' drug organization. Each testified in detail about the structure and membership of the narcotics organization, their respective roles in the organization as well as the leadership positions enjoyed by Birkett and Sanchez, the location of the Defendants' drug spot, the hours of operation, the price and color of the baggies of crack cocaine that the Defendants' organization offered for sale, the quantity of $5 bags of crack cocaine that the organization sold on a typical day, and the location of the stash houses where the Defendants cooked and bagged the crack. (Tr. 44–186, 224–317, 328–427.)

The testimony of Clyburn, Helvy and Martin was more than enough to establish the existence of the charged conspiracy. Their testimony that the conspiracy existed was also fully corroborated by other evidence offered at trial, including 1) the testimony of the undercover officer that he purchased crack cocaine from four of the pleading co-conspirators, and 2) surveillance videotapes showing two of the pleading co-conspirators selling crack cocaine. In light of this overwhelming evidence about the existence and scope of the conspiracy, the *Crawford* error did not seriously affect the outcome of the trial.

While Defendants argue that the admission of the six plea allocutions amounted to a directed verdict as to the quantity of narcotics attributable to the conspiracy, the strength and abundance of the evidence presented at trial that a conspiracy existed, that overt acts were taken in furtherance of the conspiracy, and that the conspiracy involved the distribution of at least fifty grams of cocaine base made the admission of the plea allocutions merely cumulative.

From the evidence offered at trial, excluding the six plea allocutions, the jury reasonably could have concluded that Defendants participated in the charged conspiracy. *See United States v. Anglin*, 169 F.3d 154, 159 (2d Cir.1999) (deferring "to the jury's determinations of the weight of the evidence and the credibility of witnesses, as well as to the jury's choice of the competing inferences that can be drawn from the evidence").

Moreover, the jury received explicit instructions from the Court that it could only consider the plea allocutions as evidence that a conspiracy existed and not as evidence of Defendants' membership in that conspiracy. It is presumed that this

instruction was followed. *United States v. McClain,* 377 F.3d 219, 223 (2d Cir.2004) (citing *United States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002)).

Thus, the *Crawford* error did not contribute to the verdict obtained against Defendants with respect to either the determination of their guilt or the quantity of cocaine base involved in the conspiracy. *See Bruno,* 383 F.3d at 79. As such, the *Crawford* error did not result in plain error, and no new trial is warranted.

## II. *Reconsideration of Defendants' Rule 33 Motions Is Not Warranted*

In its July 8, 2005 Order, the Second Circuit upheld this Court's denial of Defendants' previous Rule 33 motions:

> The district court, following a thorough review of the evidence presented at trial, denied the motions on the ground that introduction of the letters would not have altered the outcome of the trial. There is no basis for finding that the denial of the motions was an abuse of discretion. However, because of the possibility that the district court's denial of the Rule 33 motion was based, in part, on the improperly admitted plea allocutions, we authorize the district court to determine on remand whether to reconsider the motions.

(Order at 4.)

Rule 33 of the Federal Rules of Criminal Procedure entitles a defendant to a new trial only if "the interests of justice so require." Fed.R.Crim.P. Because of their extraordinary nature, "motions for a new trial are disfavored in this Circuit." *United States v. Gambino,* 59 F.3d 353, 364 (2d Cir.1995). Such motions are granted "sparingly and in the most extraordinary circumstances." *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992). While the trial court may weigh the evidence and the credibility of the witnesses on a Rule 33 motion, the Second

Circuit has warned against "wholly usurping the role of the jury." *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir.2001). Accordingly, a motion for a new trial should be granted only where "letting a guilty verdict stand would be a manifest injustice," *Ferguson,* 246 F.3d at 134, or where the district court has "a real concern that an innocent person may have been convicted," after examining the totality of the evidence and considering objectively all of the facts and circumstances of the case. *Sanchez,* 969 F.2d at 1414. In short, "[i]t is only when it appears that an injustice has been done that there is a need for a new trial 'in the interests of justice.'" *Id.*

Here, the Defendants' first Rule 33 motion was based on purported newly-discovered evidence, and their second Rule 33 motion was based on testimony given at a *Fatico* hearing. The Court denied both motions on the basis that the new evidence would not have altered the outcome of the trial. While the Court's ruling was based in part on the strength of the government's case at trial, the admission of the six co-conspirators' plea allocutions—the exclusion of which would not have cast doubt on the Defendants' guilt—was cumulative, as discussed above. As such, the Court's denials of Defendants' Rule 33 motions are unaffected by *Crawford* and do not warrant reconsideration.

## *Conclusion*

For the reasons set forth above, the undisputed *Crawford* error does not constitute plain error, and reconsideration of the Court's prior denials of Defendants' Rule 33 motions is not warranted. As such, no new trial is awarded. Defendants are instructed to proceed to re-sentencing.

It is so ordered.